IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CALVIN JOHNSON,

    Defendant.

CRIMINAL CASE NO.
1:11-CR-00441-JOF-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

Pending before this Court is Defendant Calvin Johnson's ("Defendant") perfected Motion to Suppress Evidence. Docket Entries [10, 20]. Having considered Defendant's motion and all supporting documents submitted, and for the reasons set forth below, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence be **DENIED**. Docket Entry [10].

## BACKGROUND

On September 20, 2011, the Grand Jury entered a one-count indictment against Defendant for knowingly possessing a firearm in and affecting interstate commerce as a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Indictment, Docket Entry [1]). Prior to being indicted, Defendant had been serving a sentence of parole under the supervision of the Georgia Board of Pardons and Paroles ("GBPP").

## A.  **Terms and Conditions of Defendant's Parole**

On March 24, 2011, Defendant met with senior GBPP officer Shari Robinson at the South Metro Parole Office for an "initial intake" interview following his release from prison on parole. (Transcript of December 15, 2011 hearing ("Tr."), Docket Entry [15], 4-7). During this meeting, Officer Robinson and Defendant reviewed the Parole Certificate that Defendant signed that day. (Tr. 9-12; Parole Certificate, Gov't's Ex. 1). Both Officer Robinson and Defendant each had a copy of the Parole Certificate as they reviewed the document. (Tr. 11).

The first page of the Parole Certificate indicates that Defendant had been incarcerated for possession with the intent to distribute marijuana; Defendant was to be on a term of parole from March 24, 2011,[1] until December 17, 2012; Defendant's residence of record during his parole was 2728 Live Oak Trail, Atlanta, Georgia, 30349; and Defendant was subject to certain special conditions specific to him, such as being placed on electronic monitoring, receiving a substance abuse assessment, attending educational courses, and not having any contact with Christy Upshaw. (Tr. 9; Gov't's Ex. 1). The second page of the Parole Certificate sets forth six standard conditions of parole that apply to all parolees. (Tr. 9-10, 63; Gov't's Ex. 1). In particular, the second condition entitled "Law/Immediate Notification of Searches" provides:

I will not violate the law of any governmental unit. I will immediately

---

[1] Although the Parole Certificate lists the effective date of Defendant's parole as December 1, 2010, (Parole Certificate, Gov't's Ex. 1), Officer Robinson testified that the effective date of Defendant's parole was March 24, 2011, (tr. 9).

notify my parole officer if I am arrested for any offense, including a traffic offense. My parole officer or any other parole officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control.

(Tr. 10-11; Gov't's Ex. 1). Officer Robinson read each of the six conditions verbatim to Defendant and then explained the conditions "in laymen's terms." (Tr. 10). For the second condition, Officer Robinson explained:

I let them know that if they are stopped or questioned by a police officer at any time to let me know. It can be anything as minor as a traffic citation or them questioning [the parolee] in regards to any type of criminal offense like an armed robbery or burglary or anything like that. Anytime [the parolee] come[s] in contact with the[] [police], I let the[] [parolee] know that their residence can be searched. If we have reasonable suspicion that they are doing anything wrong that their residence can be searched because they don't have any Fourth Amendment rights on parole.

(Tr. 11). Defendant and another parole officer signed the second page of the Parole Certificate. (Tr. 11; Gov't's Ex. 1). The third page of the Parole Certificate is identical to the second page, and Officer Robinson and Defendant signed that page. (Tr. 11; Gov't's Ex. 1).

Officer Robinson described Defendant's demeanor during their initial March 24, 2011 meeting as "calm." (Tr. 12). Defendant was not handcuffed during the meeting. (Tr. 8). Defendant appeared to understand Officer Robinson's questions, and his answers were responsive to her questions. (Tr. 12). Defendant did not ask any questions regarding his rights, nor did he object to, or refuse to abide by, any of the standard conditions. (Tr. 12-13). Defendant did not slur his speech and did not otherwise appear to be under the influence of any drugs or alcohol. (Tr. 13-14). Officer

3

Robinson did not threaten Defendant, promise him anything in exchange for signing the Parole Certificate, or physically touch or handle Defendant in any way. (Tr. 14). The entire meeting lasted approximately thirty to forty-five minutes. (Tr. 14).

## B.   <u>Officer Robinson's Supervision of Defendant</u>

Officer Robinson supervised Defendant as his parole officer from approximately March 24, 2011, until June 22, 2011. (Tr. 15). During Officer Robinson's supervision, Defendant violated the conditions of his parole on several occasions. (Tr. 15). Defendant failed to obtain employment and failed to provide proof that he had entered school. (Tr. 13, 15, 22). Defendant also had nine electronic-monitoring/curfew violations from April 1, 2011, through April 29, 2011. (Tr. 15-16). As Officer Robinson explained:

> With Mr. Johnson his [electronic-monitoring] curfew was Monday through Friday. He could leave at 7:00 a.m. and then he would have to be back in the house at 7:00 p.m. and on weekends he couldn't go anywhere. So it would be violations where he would come in a little late, maybe like 10 to 15 minutes late, but then he would leave the residence again between like maybe 30 to 45 minutes and then come back.

(Tr. 16). In addition, Defendant had two overnight electronic-monitoring violations. (Tr. 17).

Based on Defendant's multiple electronic-monitoring violations, Officer Robinson called Defendant in for an administrative hearing to address the violations with Defendant. (Tr. 16). Officer Robinson planned to recommend "short-term incarceration" for Defendant based on the two overnight electronic-monitoring

violations. (Tr. 17). On the day of the hearing, May 2, 2011, Defendant reported to the parole office in a new, white Dodge Charger. (Tr. 16-17). Defendant's arrival in a new vehicle raised Officer Robinson's suspicions because Defendant did not have a job.[2] (Tr. 17). As a result, Officer Robinson decided against short-term incarceration, and instead requested that Defendant be placed on the next warrant detail for a "compliance check." (Tr. 17-18). A compliance check involves parole officers "[g]oing to the [parolee's] residence, making sure that [the parolee] [is] there in accordance to curfew, and . . . check[ing] the room and common areas of the house to make sure that there is [sic] no guns or drugs or anything that they are not suppose to have." (Tr. 29-30).

Before the compliance check occurred, however, on May 5, 2011, Defendant was arrested by the Atlanta Police Department for reckless driving and possession of marijuana. (Tr. 18, 20). That arrest, according to Officer Robinson, constituted another violation of Defendant's parole. (Tr. 20). After Defendant's release from jail on June 22, 2011, he had another administrative hearing, at which he was again reprimanded for his parole violations. (Tr. 21). On the same day, Defendant was transferred to GBPP officer Taneshia Sims's case load.[3] (Tr. 15, 21, 34).

---

[2] Officer Robinson testified that Defendant said his mother rented the Dodge Charger for him. (Tr. 28). Officer Robinson did not take any action to verify whether Defendant's statement about the Dodge Charger was accurate. (Tr. 28-29).

[3] Defendant was transferred to Officer Sims because Officer Robinson moved to another office. (Tr. 28).

## C.    The Search of Defendant's Residence

At approximately 7:00 a.m. on July 1, 2011, Officer Sims and three other state parole officers attempted to serve an arrest warrant on Defendant at his residence of record, 2728 Live Oak Trail. (Tr. 34-36). No federal officers were present. (Tr. 36). The state parole officers approached Defendant's residence, and Officer Sims knocked on the door. (Tr. 37). Defendant's sister answered the door, and Officer Sims advised her that they were there to serve an arrest warrant on Defendant. (Tr. 37). Defendant's sister responded that Defendant was not home. (Tr. 37). Defendant's grandmother subsequently joined the conversation and inquired about what was happening. (Tr. 37). Officer Sims explained that the parole officers had a warrant for Defendant's arrest and that they needed to "clear" the residence "to make sure that [Defendant] wasn't there." (Tr. 37). Defendant's grandmother "said that was fine." (Tr. 37). Officer Sims asked permission to "clear the house," and Defendant's grandmother and mother, who was called to join the conversation by Defendant's sister and grandmother, gave their permission. (Tr. 38). No one objected to the parole officers clearing the residence. (Tr. 38).

Defendant's sister and grandmother directed the parole officers to Defendant's bedroom downstairs. (Tr. 37-38). While Officer Sims remained with Defendant's sister and grandmother, the other parole officers went downstairs to Defendant's room, "cleared [Defendant's] room," and "cleared the garage." (Tr. 37). The parole officers did not locate Defendant in the residence. (Tr. 37). Having cleared the residence and

6

the garage, the parole officers searched Defendant's bedroom and the garage only. (Tr. 38). The parole officers did not request permission to search Defendant's bedroom. (Tr. 39). During the search, the parole officers recovered a firearm, a magazine loaded with ammunition, and drug paraphernalia in Defendant's bedroom and garage.[4] (Tr. 38). One of the parole officers told Defendant's family members about what they had recovered. (Tr. 40). The family members told the parole officer that they had no information about the weapon being in the home, nor did the weapon belong to any of them. (Tr. 40). The family members executed a written statement to that effect. (Tr. 40). The search of Defendant's residence took approximately thirty to forty-five minutes. (Tr. 39). The parole officers had firearms with them, but their firearms remained in their respective holsters during the entire search of the residence. (Tr. 39).

While the parole officers were at Defendant's residence, Defendant's sister contacted Defendant and allowed Officer Sims to speak to him. (Tr. 40). Officer Sims instructed Defendant to report to the South Metro Parole Office. (Tr. 40). Officer Sims did not tell Defendant about the items the parole officers had recovered at his residence at that time. (Tr. 49).

**D.    The Interview of Defendant**

At approximately 8:00 a.m., the morning of the search, Defendant reported to the South Metro Parole Office as instructed. (Tr. 41). Defendant waited in the lobby for

---

[4] Officer Sims could not recall specifically where each item was recovered. (Tr. 38).

approximately ten to fifteen minutes before the parole officers called him back into the office. (Tr. 41, 50). Chief Officer Kenneth Morrow, the chief GBPP parole officer at the South Metro Parole Office, explained that they had reason to believe that Defendant possessed a firearm because earlier that morning the parole officers had recovered an empty firearm box and a magazine loaded with ammunition in Defendant's residence. (Tr. 56, 58-59). As Defendant exited the lobby and entered the office area, the parole officers ordered him to get on the ground and took him into custody. (Tr. 41, 50, 57). Defendant was handcuffed at that time. (Tr. 50). Chief Officer Morrow searched Defendant's person and recovered two cellular telephones and a personal item.[5] (Tr. 58). Chief Officer Morrow took possession of the cellular telephones. (Tr. 41, 58). Officer Sims and Chief Officer Morrow advised Defendant that he was being taken into custody for electronic-monitoring violations. (Tr. 41-42, 50-51, 66). Defendant was then placed in a holding room.[6] (Tr. 51, 58).

At approximately 9:00 a.m., thirty to forty-five minutes after the parole officers placed Defendant in the holding room, Special Agent Allen McLeod, an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), arrived to interview Defendant. (Tr. 52, 59, 70, 72). Special Agent McLeod had received telephone calls

---

[5] While Officer Sims testified that Chief Officer Morrow also recovered a wallet from Defendant's person, (tr. 41), Chief Officer Morrow could not recall whether he recovered a wallet or an identification card, (tr. 58, 64).

[6] Officer Sims described the holding room as "a basic room with chairs," no other furniture, and "a lock on the door." (Tr. 51).

from parole officers regarding the recovery of the firearm in Defendant's residence.[7] (Tr. 71). When Special Agent McLeod arrived at the office, he met with the parole officers who had searched Defendant's residence, and then he test-fired the firearm (an assault rifle) the parole officers recovered. (Tr. 72). From firing the weapon, Special Agent McLeod determined the rifle was operating as a semiautomatic weapon. (Tr. 72). Special Agent McLeod also asked for a printout of Defendant's criminal history. (Tr. 72). Special Agent McLeod then went to meet with Defendant. (Tr. 72).

Special Agent McLeod and Defendant met in a conference room, and they sat at the corner of a long, wooden conference table. (Tr. 72-73). Two parole officers were also present for the interview. (Tr. 72-73). Special Agent McLeod asked that Defendant's handcuffs be removed, which the parole officers did. (Tr. 73). Special Agent McLeod had a firearm in his holster, but did not remove it at any time during the interview. (Tr. 73). Likewise, the parole officers were armed, but they did not remove their respective firearms from their holsters during the interview. (Tr. 73-74).

After the parole officers removed Defendant's handcuffs, Special Agent McLeod identified himself to Defendant as an ATF agent, not a Georgia parole officer. (Tr. 74). Special Agent McLeod explained to Defendant that the conditions of his parole did not require him to answer any questions posed by Special Agent McLeod or to answer the

---

[7] Chief Officer Morrow explained that GBPP has a "working relationship" with local and federal law enforcement agencies. (Tr. 66). For example, if a firearm is recovered in a parolee's residence, GBPP may contact federal law enforcement, such as ATF, to run a trace on that firearm. (Tr. 66-67, 83).

questions truthfully. (Tr. 74, 76). Special Agent McLeod did, however, advise Defendant that if he choose to speak with him "it would behoove [Defendant] not to lie to him." (Tr. 77). Before Defendant made any statements, Special Agent McLeod read the Miranda[8] warnings to Defendant verbatim from a pre-printed Miranda card. (Tr. 74-75). Specifically, Special Agent McLeod advised Defendant that he had the right to remain silent; anything he said could be used against him in court; he had the right to consult with an attorney and have an attorney present during questioning; and if he could not afford an attorney, one would be appointed to represent him prior to questioning. (Tr. 75). Having advised Defendant of his Miranda rights, Special Agent McLeod asked Defendant two questions. (Tr. 75-76). First, Special Agent McLeod asked Defendant if he understood his rights, and Defendant stated that he did. (Tr. 76). Second, Special Agent McLeod asked Defendant if he was willing to waive his rights and speak to him. (Tr. 76). Defendant stated that he was. (Tr. 76).

Special Agent McLeod then inquired about the origins of the assault rifle the parole officers recovered and the whereabouts of the firearm that belonged in the empty firearm box the parole officers recovered. (Tr. 77). Defendant said that "the firearm that had been located in his closet did not belong to him" and that "[a] lot of people come through his house." (Tr. 78). Special Agent McLeod then asked Defendant who else lived at his residence. (Tr. 78). Defendant said that his thirteen year old sister and thirty-eight year old mother lived with him at his residence. (Tr. 78). Special Agent

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

McLeod then asked Defendant whether the firearm belonged to either his mother or his sister. (Tr. 78). In response, Defendant "began to smile," "put his head down" and stated, "'I'll take this charge. I'll take this one.'" (Tr. 78). Defendant also stated that he had no knowledge of the empty firearm box parole officers told Special Agent McLeod they had recovered from the garage. (Tr. 78). The interview lasted less than ten minutes. (Tr. 78).

Defendant appeared "very clam" and "did not appear [to be] under the influence of anything." (Tr. 76). Defendant appeared to understand Special Agent McLeod's questions, and Defendant's answers were responsive to those questions. (Tr. 76). Defendant did not ask any questions about his <u>Miranda</u> rights. (Tr. 76). Special Agent McLeod did not threaten Defendant in any way, nor did he promise Defendant anything in return for speaking with him. (Tr. 77). Special Agent McLeod did not touch Defendant in any way, nor did he witness any other officer do so, except to remove Defendant's handcuffs. (Tr. 77). Defendant did not request an attorney at any time, and he did not refuse to answer any questions. (Tr. 78). After the interview, Special Agent McLeod left the South Metro Parole Office with the assault rifle and the weapon-related items. (Tr. 68, 78-79).

### E.     The Search of Defendant's Cellular Telephones

Approximately thirty minutes after Special Agent McLeod's interview and after Special Agent McLeod left the South Metro Parole Office, Chief Officer Morrow searched one of Defendant's cellular telephones. (Tr. 59-60). Specifically, as Chief

Officer Morrow prepared to place the cellular telephones into an evidence bag, he turned on one of the telephones and scrolled through Defendant's photographs. (Tr. 59). In one of the photographs, Chief Officer Morrow observed Defendant holding what appeared to be the same assault rifle parole officers had recovered from Defendant's residence that morning. (Tr. 59). After searching the one cellular telephone, Chief Officer Morrow contacted Special Agent McLeod and told him what he saw on Defendant's cellular telephone. (Tr. 60-61, 79). Chief Officer Morrow was unable to search Defendant's second cellular telephone, an iPhone, because of a code on the telephone. (Tr. 69).

Chief Officer Morrow made the decision to search Defendant's cellular telephone on his own, and no person or federal officer asked him to do so. (Tr. 60). In fact, Special Agent McLeod was not aware the parole officers had recovered any cellular telephones from Defendant until he received the telephone call from Chief Officer Morrow about what he found. (Tr. 79-80). Prior to searching the cellular telephone, Chief Officer Morrow had not received any information that Defendant's case had been accepted for federal prosecution. (Tr. 60). In the same manner, Special Agent McLeod testified that Defendant's case had not been accepted for prosecution by the United States Attorney's Office, and he had not yet even presented the case for prosecution. (Tr. 80).

On or about July 8, 2011, Special Agent McLeod applied for, and obtained, a federal search warrant for both of Defendant's cellular telephones. (Tr. 80-81; Gov't's

Ex. 4). ATF executed the federal search warrant as to Defendant's LG cellular telephone (the telephone Chief Officer Morrow searched), but was unable to execute the search warrant as to Defendant's iPhone. (Tr. 82; Gov't's Ex. 4).

### E.   The Revocation of Defendant's Parole

On or about July 8, 2011, Officers Robinson and Sims presented Defendant with a Waiver of Final Hearing form at the Fulton County Jail. (Tr. 21-22). Defendant signed the form and agreed to the reckless driving and drug possession charges and to not obtaining employment. (Tr. 22). Defendant did not agree to (and struck through) certain other offenses listed on the waiver form, including the possession of a firearm charge. (Tr. 22, 24). Based on the waiver form Defendant signed and the infractions to which Defendant agreed, Defendant's parole was revoked. (Tr. 22).

## LEGAL ANALYSIS

### A.   Defendant's Fourth Amendment Rights Were Not Violated by the Search of His Residence.

Defendant challenges the search of his residence on three grounds. Defendant first argues that the parole officers' search of his residence exceeded the scope of the arrest warrant the parole officers obtained. Defendant next argues that the parole officers were required to have reasonable suspicion in order to search Defendant's bedroom and the garage based on Georgia law and based on a statement Officer Robinson made during Defendant's initial intake meeting. Lastly, Defendant argues that the parole officers lacked reasonable suspicion when they searched Defendant's

residence.

### 1. The Search of Defendant's Home Was Not Conducted Pursuant to the Arrest Warrant.

Defendant contends the search of his residence was unconstitutional because it was outside of the scope of the arrest warrant the parole officers obtained. However, as the Government notes, this argument is a red herring. The Government does not take the position that the arrest warrant provided the justification for the parole officers' search of Defendant's residence. Instead, the Government contends that the search of Defendant's residence was conducted pursuant to the terms of Defendant's Parole Certificate.

Initially, this Court notes that the Eleventh Circuit approved a search similar to the one conducted here in United States v. Stewart, 213 F. App'x 898 (11th Cir. 2007). In Stewart, police officers executed an arrest warrant for the defendant for violation of his parole. Id. at 898. Although Defendant was found hiding under the covers of his father's bed, the officers nevertheless searched the defendant's bedroom and found a firearm. Id. at 899. The Eleventh Circuit upheld the search of the defendant's bedroom as authorized by the terms of the defendant's parole certificate, without any mention of the arrest warrant. Id. Accordingly, Defendant's argument is without merit.

### 2. The Parole Officers Were Not Required to Have Reasonable Suspicion for the Search of Defendant's Residence.

Defendant next argues that the parole officers were required to have reasonable suspicion to conduct the warrantless search of Defendant's residence based on one of

Officer Robinson's statements to Defendant during his initial intake interview on March 24, 2011, and based on unspecified "provisions of Georgia law." Therefore, Defendant argues, the Supreme Court's ruling in Samson v. California, 547 U.S. 843 (2006), does not control. This Court disagrees.

The Fourth Amendment of the United States Constitution provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. Under the Supreme Court's general Fourth Amendment approach, courts examine the totality of the circumstances to determine whether a search is reasonable within the meaning of the Fourth Amendment. Samson, 547 U.S. at 848. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." United States v. Knights, 534 U.S. 112, 118-19 (2001) (internal citation and quotations omitted); United States v. Yuknavich, 419 F.3d 1302, 1309 (11th Cir. 2005).

Defendant's status as a parolee affects both sides of the balance. Knights, 534 U.S. at 119. Defendant's status as a parolee militates in favor of the notion that he has a severely diminished expectation of privacy. Samson, 547 U.S. at 852. Parolees, who enjoy less liberty than average citizens, have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation. Samson,

547 U.S. at 850. The Supreme Court has pointed out that "the essence of parole is release from prison, before completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." Id. at 850 (internal citation and quotations omitted).

Consistent with the Supreme Court's discussion of parolees, Defendant's status as a Georgia parolee severely restricted his liberty. Pursuant to O.C.G.A. § 42-9-44, the GBPP may adopt general rules concerning the conditions of parole, including requirements that the parolee shall not leave the state or any definite area within the state without the consent of the board, shall contribute to the support of his dependents to the best of his ability, shall make reparation for his crime, shall abandon evil associates and ways, and shall abide by the instructions of his supervisor. O.C.G.A. § 42-9-44. In addition, parolees who do not have a high school diploma or general education development equivalency diploma ("GED") shall be required to obtain a diploma or GED. O.C.G.A. § 42-9-44(b).

As for this Defendant in particular, the GBPP required that he be placed on electronic monitoring, receive a substance abuse assessment and follow through with any recommendations made, attend educational courses, and avoid contact with Christy Upshaw. (Parole Certificate, p. 1). In addition, Defendant, like all other Georgia parolees, agreed to participate in a rehabilitation plan designed by his parole officer; work; submit to drug tests; truthfully answer all questions and follow all written and verbal instructions from his parole officer or any other employee of GBPP; not violate

16

the law of any governmental unit; immediately notify his parole officer if he was arrested for any offense; not possess a firearm, ammunition, explosives, or other deadly weapons; not leave his state of residence; and not change his residence without permission from his parole officer. (Parole Certificate, pp. 2-3). Furthermore, Defendant was required to remain in his residence, except between the hours of 7:00 a.m. to 7:00 p.m. Monday through Friday when Defendant was permitted to leave his residence. (Tr. 16). Of most significance here, Defendant agreed to submit to warrantless searches of his person, papers, place of residence, automobile, or other property under his control, at any time, by his parole officer or any other parole officer, thereby greatly reducing his expectation of privacy. (Parole Certificate, pp. 2-3).

While Defendant's expectation of privacy was significantly reduced, the State of Georgia has a strong concern that a parolee will be more likely than an ordinary member of the community to engage in criminal conduct. Knights, 534 U.S. at 121. Therefore, the State of Georgia's focus on parolees, more so than the average citizen, is justified because of its interest in protecting potential victims of criminal enterprise. Knights, 534 U.S. at 121. Additionally, the State of Georgia has a substantial interest in supervising parolees in order to reduce recidivism and promote reintegration. Samson, 547 U.S. at 849; Stewart, 213 F. App'x at 899. The Supreme Court has repeatedly reiterated that a State's interest in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrants privacy intrusions that would not otherwise be tolerated under the Fourth

17

Amendment. Knights, 534 U.S. at 120-21; Griffin v. Wisconsin, 483 U.S. 868, 879 (1987). Under these circumstances, the conditions of Defendant's release so diminished his expectation of privacy, that even a suspicionless search does not violate his Fourth Amendment rights. Samson, 547 U.S. at 857; Stewart, 213 F. App'x at 899 (holding that warrantless and suspicionless search of a Georgia parolee's home did not violate the Fourth Amendment because the parole certificate required him to submit to a search of his home at any time, without a warrant).

Defendant argues that the Government cannot rely upon the Supreme Court's holding in Samson because searches of parolees require reasonable suspicion "[u]nder the provisions of Georgia law" and based on a statement Officer Robinson made during Defendant's initial intake meeting. Other than the passing reference to Georgia law, Defendant fails to identify any specific provision of the Georgia code or any Georgia case law that mandates reasonable suspicion for a parolee search conducted by GBPP. Therefore, this Court deems this argument to have been abandoned by Defendant. See United States v. Cleckler, 265 F. App'x 850, 853 n.3 (11th Cir. 2008) (deeming defendant to have abandoned an argument where defendant made a passing reference to the issue but did not otherwise develop the argument).

Next, Officer Robinson testified that she read the six standard conditions of parole set forth on the second and third pages of the Parole Certificate verbatim to Defendant. (Tr. 10). The second condition states:

I will not violate the law of any governmental unit. I will immediately

> notify my parole officer if I am arrested for any offense, including a traffic offense. My parole officer or any other parole officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control.

(Tr. 10-11; Gov't's Ex. 1). Officer Robinson then explained the second condition as follows:

> I let them know that if they are stopped or questioned by a police officer at any time to let me know. It can be anything as minor as a traffic citation or them questioning [the parolee] in regards to any type of criminal offense like an armed robbery or burglary or anything like that. Anytime [the parolee] come[s] in contact with the[] [police], I let the[] [parolee] know that their residence can be searched. *If we have reasonable suspicion that they are doing anything wrong that their residence can be searched because they don't have any Fourth Amendment rights on parole.*

(Tr. 11) (emphasis added). Defendant then signed the second and third pages of the Parole Certificate. (Tr. 11; Gov't's Ex. 1).

Contrary to Defendant's argument, Officer Robinson did not testify that searches of parolees require reasonable suspicion. Instead, Officer Robinson described to Defendant, a couple of instances in which parole officers could search his residence. For example, if parole officers had reasonable suspicion of any wrongdoing, then they could search Defendant's residence.[9] Also, if Defendant came into contact with police, then parole officers could search his residence. More importantly, Officer Robinson underscored these examples by communicating the broader principle that Defendant did

---

[9] Officer Robinson did not say that parole officers could not search Defendant's residence if they did not have reasonable suspicion or that parole officers could only search Defendant's residence with reasonable suspicion.

not "have any Fourth Amendment rights while on parole." (Tr. 11). Although Defendant argues that he was "not 'unambiguously' informed that his residence could be searched without reasonable suspicion," it is clear that Defendant was verbally advised that he had no Fourth Amendment rights while on parole and was advised in writing that any parole officer could conduct a warrantless search of his residence at any time. Notably, Defendant did not ask any questions about the standard conditions Officer Robinson discussed with him, (tr. 12-13), and he signed the Parole Certificate, agreeing to the standard conditions set forth therein, (tr. 11; Gov't's Ex. 1).

### 3. The Parole Officers Had Reasonable Suspicion to Search Defendant's Residence.

Even if, as Defendant argues, reasonable suspicion was required for the search of his residence, the requisite suspicion was present here. Reasonable suspicion consists of "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." Knights, 534 U.S. at 121 (internal citation omitted). When making the reasonable suspicion determination, the court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. It is clear that an inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required." United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003) (internal citations and quotations omitted). "[T]he officer must be able to point to specific and articulable

facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Boyce, 351 F.3d 1102, 1107 (11th Cir. 2003) (internal citation and quotations omitted).

In this case, Officer Robinson made the decision to schedule Defendant for a compliance check on May 2, 2011. Prior to that time, Defendant had nine electronic-monitoring violations, including two overnight violations, from April 1, 2011, until April 29, 2011. (Tr. 16-17). Based on these violations, Officer Robinson made the decision to call Defendant in for an administrative hearing on May 2, 2011, to discuss the violations. In fact, Officer Robinson planned to revoke Defendant's parole and recommend short-term incarceration based on Defendant's two overnight violations. Defendant then arrived at the administrative hearing in a brand new, white Dodge Charger. This aroused Officer Robinson's suspicion because Defendant was not employed. Defendant's nine electronic-monitoring violations within a span of one month and almost immediately after being placed on parole, coupled with a new vehicle with no employment, provided reasonable suspicion of wrongdoing for GBPP to search Defendant's residence.[10]

Additionally, before the parole officers actually conducted the compliance check, Officer Robinson's suspicions were arguably confirmed when, on May 5, 2011,

_____

[10] Defendant attempts to undercut Officer Robinson's suspicion about the new Dodge Charger by pointing out that Officer Robinson did not follow-up on Defendant's claim that his mother had rented the vehicle for him. However, this Court observes that Defendant did not introduce any evidence to support this contention.

Defendant was arrested by the Atlanta Police Department for reckless driving and possession of marijuana. Defendant's arrest constituted another parole violation. Significantly, Defendant was on parole from a prior conviction for possession with intent to distribute marijuana. Thus, the totality of the circumstances present here easily reaches the reasonable suspicion threshold.[11]  Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress  the evidence obtained from the search of Defendant's residence be **DENIED**.

### B. Defendant Waives His Challenge to the Search of His Cellular Telephone.

Defendant superficially challenges Chief Officer Morrow's search of his cellular telephone. In the conclusion paragraph of Defendant's brief, Defendant states "[a]lso subject to suppression are the fruits of the officers and agent's unconstitutional activity, including . . . the search of the telephones conducted by Chief Morrow, which was undertaken without authority, and the results of which were disclosed to Agent McLeod prior to his application for any later warrant." (Def.'s Br., Docket Entry [20], p. 15). Defendant, however, offers no explanation as to why Chief Officer Morrow's search of his cellular telephone was without authority. Consequently, this Court concludes that Defendant has waived any argument with respect to Chief Officer Morrow's search of his cellular telephone. See Cleckler, 265 F. App'x at 853 n.3 (deeming defendant

---

[11] On the Waiver of Final Hearing form that Defendant signed before his parole was revoked, Defendant agreed to the reckless driving and marijuana possession infractions.

to have abandoned an argument where defendant made a passing reference to the issue but did not otherwise develop the argument).

Moreover, this Court observes that Chief Officer Morrow's search of Defendant's cellular telephone falls under the umbrella of the Parole Certificate that Defendant signed on March 24, 2011. Defendant agreed that his "parole officer or any other parole officer may, at any time, conduct a warrantless search of [his] person, papers, and place of residence, automobile, *or any other property under [his] control*." (Parole Certificate, pp.2-3) (emphasis added). The cellular telephone, which Chief Officer Morrow recovered from Defendant's person upon arresting Defendant at the South Metro Parole Office, qualifies as "other property under [Defendant]'s control." Therefore, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress the evidence obtained as a result of the search of his cellular telephone be **DENIED**.

### C. Defendant's Statements to Special Agent McLeod Did Not Violate Miranda.

Defendant argues that GBPP parole officers and ATF Special Agent McLeod collusively obtained statements from him in derogation of his rights under Miranda, by having GBPP inform Defendant that he was under arrest for electronic-monitoring violations, but then having Special Agent McLeod read Defendant his Miranda warnings and interrogate him about the assault rifle and other weapon-related items recovered from his residence. This Court finds that Defendant knowingly and voluntarily waived his Miranda rights before talking to Special Agent McLeod.

23

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial. U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000); Bram v. United States, 168 U.S. 532, 542 (1897). In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations. Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress's attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient). The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). A defendant may waive his Miranda rights "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. The waiver inquiry is two-pronged. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." North Carolina v. Butler, 441 U.S. 369, 373 (1979); see also United States v. Beckles,

24

565 F.3d 832, 840 (11th Cir. 2009) (same). Defendant's waiver of his <u>Miranda</u> rights meets both prongs of the inquiry.

First, Defendant's waiver was voluntary. According to Special Agent McLeod, during Defendant's interview, Defendant appeared to be "very calm" and did not appear to be "under the influence of anything." Special Agent McLeod did not threaten Defendant in any way, nor did he promise Defendant anything in return for speaking to him. Special Agent McLeod did not touch Defendant in any way, nor did he witness either of the other parole officers present do so, except to remove Defendant's handcuffs. Neither Special Agent McLeod nor the parole officers present removed their holstered weapons. The record is devoid of any evidence of intimidation or coercion on behalf of Special Agent McLeod and/or the parole officers present.

Second, Defendant's waiver was knowing and intelligent. Special Agent McLeod began his interview with Defendant by introducing himself and explaining that he is an ATF agent and not a Georgia parole officer. Special Agent McLeod also explained to Defendant that the conditions of Defendant's parole did not require him to speak to Special Agent McLeod or to answer his questions truthfully. Notably, before Defendant made any statements, Special Agent McLeod read the <u>Miranda</u> warnings to Defendant from a pre-printed <u>Miranda</u> card. Having done so, Special Agent McLeod asked Defendant if he understood his rights. Defendant stated that he did. Special Agent McLeod then asked Defendant if he was willing to waive his rights and speak to him. Defendant responded affirmatively. Accordingly, the record shows

that Defendant voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights.

Defendant argues that Special Agent McLeod colluded with the parole officers to obtain Defendant statements because the parole officers initially informed Defendant that he was under arrest for electronic-monitoring violations, and Defendant waived his <u>Miranda</u> rights predicated on his reasonable belief that he was being interviewed about those monitoring violations. Defendant's argument, however, is unfounded.

As an initial matter, the Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." <u>Moran</u>, 475 U.S. at 422. In <u>United States v. Barner</u>, 572 F.3d 1239 (11th Cir. 2009), the Eleventh Circuit dismissed a similar argument from the defendant there that his waiver of <u>Miranda</u> was constitutionally infirm because the police failed to advise him that they were actually conducting a drug investigation, rather than a home invasion investigation. <u>Id.</u> at 1244. Although the <u>Barner</u> court recognized the relationship between the two investigations in that case, the court explained that what was most important was that the defendant "must simply be aware that he may remain silent and request a lawyer, and that his statements may be used against him." <u>Id.</u> (citing <u>Moran</u>, 475 U.S. at 422-23). Here, Special Agent

26

McLeod advised Defendant that he could remain silent and request a lawyer and that his statements may be used against him. Thus, regardless of the substance of the interrogation that followed, it is of no consequence to the _Miranda_ waiver analysis that Defendant may have believed that he was waiving his rights solely for the purpose of discussing the electronic-monitoring violations. See _Moran_, 475 U.S. at 422.

Moreover, Defendant's allegation that the parole officers and Special Agent McLeod misled him is not supported by the record testimony. While the parole officers did advise Defendant that he was being arrested for electronic-monitoring violations, Special Agent McLeod clarified any potential deception or confusion when he identified himself as an ATF agent and expressly disclaimed an affiliation with the GBPP. Special Agent McLeod also explained that the conditions of Defendant's parole did not require him to answer any questions from Special Agent McLeod or to even answer the questions truthfully. Thus, before Defendant waived his _Miranda_ rights, Defendant knew that he was speaking to a federal agent, not a Georgia parole officer.

Lastly, _Missouri v. Seibert_, 542 U.S. 600 (2004), the case upon which Defendant principally relies is inapposite to the facts presented here. In _Seibert_, the Supreme Court addressed the police protocol of conducting a custodial interrogation without giving any _Miranda_ warnings until the interrogation had produced a confession, following the confession with _Miranda_ warnings, and then "leading the suspect to cover the same ground a second time." _Id._ at 604. The Supreme Court held that the statement repeated after the _Miranda_ warnings was inadmissible. _Id._ Distinct from the facts

presented in <u>Seibert</u>, here, there is no evidence in the record that the Georgia parole officers interrogated or obtained any information from Defendant prior to Special Agent McLeod's interview of Defendant. Indeed, Chief Officer Morrow testified that no state parole officer interrogated Defendant. (Tr. 59). Instead, Special Agent McLeod was the first and only law enforcement officer to interrogate Defendant on July 1, 2011, after Defendant was taken into custody at the South Metro Parole Office. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress the statements Defendant made to Special Agent McLeod be **DENIED**.

## CONCLUSION

Based on the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence be **DENIED**. Docket Entry [10]. There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial. Therefore, this action is **CERTIFIED READY FOR TRIAL**.

**SO ORDERED, REPORTED AND RECOMMENDED** this 24th day of April, 2012.

s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

CALVIN JOHNSON,

     Defendant.

CRIMINAL CASE NO.
1:11-CR-00441-JOF-LTW

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and N.D. Ga. CrR. 59(2)(a). Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), within fourteen (14) days after service of this order, each party may file written objections, if any, to the Report and Recommendation. Pursuant to Title 18, United States Code, Section 3161(h)(1)(D), (H), **the above-referenced fourteen (14) days allowed for objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not the objections are actually filed.** If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time, all time between the filing of the R&R and the submission of the R&R, along with any objections, responses, and

replies thereto, to the District Judge. 18 U.S.C. § 3161(h)(1)(D), (H); Henderson v. United States, 476 U.S. 321, 331 (1986); United States v. Mers, 701 F.2d 1321, 1337-38 (11th Cir. 1983).

Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983), cert. denied, 464 U.S. 1050 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 24th day of April, 2012.

s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE